WEBB *et al. v.* CARTER *et al.**

STATE *ex rel.* CARTER *et al. v.* WOOLLEN.

THOMAS *et al. v.* CANNON *et al.*

(*Nashville.* December Term, 1913.)

1. **STATUTES. Enactment. Legislative quorum.**

In determining whether a quorum was present when a bill was considered by the house of representatives, the court may look to the journal of the house. (*Post, p.* 186.)

Cases cited and approved: Gaines v. Horrigan, 72 Tenn., 610; Telegraph Co. v. Nashville, 118 Tenn., 8; State, ex rel., v. Base Ball Club, 127 Tenn., 292.

2. **CONSTITUTIONAL LAW. Judicial power. Validity of enactment.**

The constitutionality of the passage of an enrolled bill or act of the legislature may be inquired into by the courts, though the enrolled bill is an act of a co-ordinate branch of the State government. (*Post, pp.* 186, 187.)

Constitution cited and construed: Art. 3, sec. 18.

Cases cited and approved: State v. McConnell, 71 Tenn., 334; Gaines v. Horrigan, supra; Nelson v. Haywood County, 91 Tenn., 608; Atchison, T. & S. F. R. Co. v. State, 28 Okl., 94.

Cases cited and distinguished: Williams v. State, 74 Tenn., 553; State, ex rel., v. Algood, 87 Tenn., 163.

3. **STATES. Legislature. Journals. Enactment. Legislative quorum.**

House Bill No. 759, subsequently purported to have been enacted as Pub. Laws 1913, ch. 37, was reconsidered by the house of representatives on April 3, 1913, after being disapproved by the governor. The journal of the house on that day showed that 52 representatives were present and voted, "Aye," in favor of passing the bill notwithstanding the governor's objections,.

---

*The authorities on the conclusiveness of an enrolled bill, are gathered in elaborate notes in 23 L. R. A., 340; and 40 L. R. A. (N. S.), 1.

Webb v. Carter.

and that 4 representatives present voted, "No," and 2 representatives answered, "Present, but not voting"; and further showed that when the names of 35 other representatives were called the speaker answered, "Not voting." A representative who voted, "No," offered an explanation of his vote which is not set out in the journal, which shows, however, that when the explanation was being read another member made the point of order that the question of "no quorum" could only be determined by a roll call, whereupon the speaker ruled that the explanation was out of order. *Held*, that the journal, when read in the light of all permissible presumptions in its favor, showed that there was no quorum of 66 members present when the bill was attempted to be passed; presumptively showing that the 35 members answered for by the speaker were not present. (*Post, pp.* 189-193.)

Constitution cited and construed: Art. 2, secs. 11, 12.

4. STATUTES. Enactment. Vote of legislature.

In view of Const. art. 2, sec. 21, requiring each legislative house to record in a journal the "ayes" and "noes" upon the final passage of every general bill, the act of the speaker of the house in answering, "Not voting," when the names of certain representatives were called, would have no greater effect than the same announcement by any other member of the house; that not being a part of his duties as speaker. (*Post, pp.* 193-201.)

Constitution cited and construed: Art. 2, sec. 21; art. 3, sec. 18.

5. STATUTES. Enactment. Journal of house of representatives. Entry of vote.

Const. art. 3, sec. 18, requiring the votes of both houses upon reconsideration of a bill after its disapproval by the governor to be determined by "ayes" and "noes" and the names of all members voting for or against the bill entered upon the journals of their respective houses, is mandatory, so that the "aye" and "no" vote must be entered upon the legislative journals. (*Post, pp.* 201, 202.)

Constitution cited and construed: Art. 3, sec. 18.

Case cited and approved: Williams v. State, supra.

Webb v. Carter.

6. **STATUTES.     Enactment.     Disapproval     by     governor.     Re-Enactment.     Order of procedure.**

Const. art. 3, sec. 18, provides if the governor refuse to sign a bill he "shall" return it with his objections to the house in which it originated, and said house "shall" cause said objections to be entered upon its journal and proceed to reconsider the bill, and, if "after such reconsideration a majority of all the members elected to that house shall agree to pass the bill notwithstanding the objections, it shall be sent with said objections to the other house by which it shall be likewise considered." *Held*, that the provision as to the order in which a bill must be reconsidered by the legislative houses is mandatory, so that a bill originating in the house of representatives was not validly passed over the governor's veto, where it was reconsidered and passed by the house, acting without a quorum, and was then sent to the senate, which also passed it over the veto, and subsequently, in an attempt to cure the defect in the action of the house, the house passed it again with a quorum present, but did not thereafter send it to the senate for its action.     (*Post, pp.* 203-226.)

Constitution cited and construed:     Art. 3, sec. 18.

Case cited and distinguished:     State v. McCann, 72 Tenn., 11.

Cases cited and disapproved:     Furnace Co. v. Railroad Co., 113 Tenn., 731; Muse v. Lexington, 110 Tenn., 655.
LANSDEN AND GREEN, JJ., dissenting.

FROM DAVIDSON.

Appeal from Chancery Court, Davidson County.— JOHN ALLISON, Chancellor.

JOHN A. PITTS, FOSTER V. BROWN, W. H. SWIGGART, SAM HOLDING, L. J. RUST and F. M. THOMPSON, attorney-general, for appellants.

Webb v. Carter.

MR. JUSTICE BUCHANAN delivered the opinion of the Court.

The controlling question in each of the above cases is the constitutionality of chapter 37 of the Public Acts of the year 1913. This act originated in the house of representatives as House Bill No. 759.

It is admitted that the bill on three readings, and according to the requirements of the constitution, was passed by the house of representatives and by the senate, and was, as required by the constitution, transmitted by the governor for his approval. In the attack here made, all the questions raised relate to what happened and what did not happen after the bill reached the governor. The governor disapproved the bill, refused to sign it, and returned it with his objections to the house in which it originated within five days after it was presented to him.

Under section 18, art. 3, of the constitution, the next step required was that the house in which the bill originated should cause said objections to be entered at large upon its journal. This requirement was never complied with. After the requirement last above mentioned, the next step authorized by section 18, art. 3, above, was that the house should proceed to reconsider the bill.

At this point, one of the main controversies in the case originates. On one side, it is insisted that the

house of representatives did proceed to reconsider the bill on April 3, 1913, and that the same was then validly passed, notwithstanding the veto of the governor. On the other side, it is said that no valid action was taken by that house on that day for the reason that no quorum was present in the house on that day.

The house of representatives, under the constitution, was entitled to ninety-nine members, and by article 2, section 11, of the constitution, it is provided that "not less than two-thirds of all the members to which each house shall be entitled shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized, by law, to compel the attendance of absent members."

To determine the question of facts as to whether a quorum was present in the house on April 3, 1913, it is well settled under our cases that we may look to the journal of the house of representatives. *Gaines v. Horrigan,* 72 Tenn. (4 Lea), 610; *Telegraph Co. v. Nashville,* 118 Tenn. (10 Cates), 8, 101 S. W., 770, 11 Ann. Cas., 824; *State, ex rel.,* v. *Base Ball Club,* 127 Tenn. (19 Cates), 292, 154 S. W., 1151.

The doctrine which obtains in some jurisdictions that an enrolled bill or act of the legislature cannot, as to the validity or constitutionality of its passage be inquired into by the judicial department of the State, because the enrolled bill is an act of a co-ordinate branch of the government of the State, has never been accepted by this court.

In one of our cases, where it was conceded that the bill under consideration was signed by the speakers of both houses and by the governor and duly enrolled and published, it was said that the presumption in favor of its regular passage through all its stages was so strong that the mere failure of the journal of the senate to show a second reading would not affect the validity of the act, but the failure would be treated as a clerical omission. *State* v. *McConnell,* 71 Tenn. (3 Lea), 334.

In another case, it is held that, notwithstanding the fact that the act is verified by the signature of the two speakers and of the governor, and has been published by proper authority, "nevertheless, the court may look to the journals of the two houses; and if from them it appears that the bill was not constitutionally passed, the act must be declared void. Such seems to be the decided weight of authority." *Gaines* v. *Horrigan,* 72 Tenn. (4 Lea), 611.

In another case, it was said: "The rule is that the journals may be looked to in order to determine whether the bill was in fact passed, but every reasonable presumption must be made in favor of the action of a legislative body acting in the apparent performance of its legal functions. The courts will not presume, from the mere silence of the journal, that the house had disregarded the constitutional requirements, unless where the constitution expressly requires the fact to appear on the journals." *Williams* v. *State,* 74 Tenn. (6 Lea), 553.

In another case, it is said: "We think the rule well settled that, where the journal does not affirmatively show the defeat of the bill, every reasonable presumption and inference will be indulged in favor of the regularity of the passage of the act subsequently signed in open session by the Speaker." *State, ex rel.,* v. *Algood,* 87 Tenn. (3 Pickle), 163, 10 S. W., 310.

In another case, where the question was whether the bill under consideration had been reconsidered in the senate after having been in the hands of a conference committee from both houses to consider certain amendments, this court, assuming that it was necessary to the valid passage of the bill that it should have been reconsidered in the senate, said: "The journals show no reconsideration; they are silent on the subject. Such silence will be treated as a case of omission." *Nelson* v. *Haywood County,* 91 Tenn. (7 Pickle), 608, 20 S. W., 4.

The cases above quoted from are referred to in *Telegraph Company* v. *Nashville,* 118 Tenn. (10 Cates), 8, 9, 101 S. W., 770, 11 Ann. Cas., 824.

In that case, in disposing of the question as to whether the section of our constitution which provides that no bill shall become a law, until it shall have been signed by the respective speakers in open session, the fact of such signing to be noted on the journals, this court held that the requirement was directory and not mandatory; but in reaching this conclusion it is clear that the court considered the journals of both the house of representatives and of the senate. This court also

examined the house and senate journals for the purpose of determining the constitutionality of the act under consideration in *State, ex rel.,* v. *Baseball Club,* 127 Tenn. (19 Cates), 296, 154 S. W., 1151.

It is to be noted that in neither of the foregoing cases was this court considering article 3, section 18, of the constitution.

The case of *Atchison, T. & S. F. R. Co.* v. *State,* 28 Okl., 94, 113 Pac., 921, 40 L. R. A. (N. S.), 1-39, is accompanied by a note presenting an exhaustive review of the rulings in different jurisdictions respecting the conclusiveness of an enrolled bill. The note discloses a great diversity of judicial opinion. Some of the cases decided by this court appear in subdivision 10, of this note, among a large number of cases from other jurisdictions which do not recognize the absolute conclusiveness of an enrolled bill.

Reverting now to the controversy upon the question whether there was or was not a quorum or sixty-six members of the house of representatives present on April 3, 1913, and turning to the journal of the house for that day, we find it showing that fifty-two representatives were present and voted, "Aye," when their names were respectively called in favor of passing the bill notwithstanding the objections of the governor. It shows four representatives present who voted, "No," when their names were called; and two representatives present, each of whom answered when their names were called, "Present, but not voting." Thus, it affirmatively appears from the journal that fifty-

eight representatives were present when the vote was taken. The names of thirty-five representatives are set out on the journal in addition to the fifty-eight, but the journal as to these thirty-five shows that, when the name of each of them was called, Mr. Speaker Stanton answered for each, "Not voting."

It is clear that the journal does not affirmatively show that the thirty-five representatives were present when the vote was taken. It is likewise clear that the journal does not affirmatively show that any one of them was present when the vote was taken; but it is said for one side of this controversy that, while the journal does not affirmatively show the presence of a quorum, it does inferentially, or by reasonable presumption, show the fact that a quorum was present when this vote was taken.

We cannot agree to this insistence. As we see the journal, the reasonable presumption is to the contrary of this insistence, and, in determining the question as to what the reasonable presumption is arising from this journal, we think it clear that the weight of authority establishes the rule that in those jurisdictions where an enrolled bill is not considered conclusive, but open to attack, judicial notice will be taken by the courts of legislative journals, both of the house and of the senate, whenever a consideration of such journals sheds light upon the question at issue.

A large array of cases to this effect may be found under subdivision 13, of the note referred to supra, in 40 L. R. A. (N. S.), at page 38.

Therefore, looking to the journal of the house of representatives for the day April 3, 1913, we see it recites the meeting of the house at 10 a. m. the calling of the same to order by the speaker, and, after prayer by the chaplain, the following: ''On motion, the calling of the roll was dispensed with.'' After dispensing, by motion, with the calling of the roll, the latter being the proper method by which to ascertain and make the journal show whether a quorum was present or no, House Bill No. 759 was put upon its passage, ''notwithstanding the objections of the executive.'' The bill was read, and then the roll was called, not for the purpose of ascertaining the presence of a quorum, but for the purpose of taking the vote and recording the same.

During the call of the roll for that purpose, when the name of Mr. Dorsey was called, he voted, ''No,'' and offered no explanation, the purport of which is not set out on the journal, but nevertheless appears with sufficient clearness. That explanation was sent to the desk, and on request of Mr. Cox, the clerk proceeded to read the explanation; but its reading was interrupted by Mr. Cox, who made the point of order that the question of no quorum could not be determined except by a roll call. We think it evident that the explanation raised the question that no quorum was present. Mr. Speaker Stanton, however, ruled the point of order well taken, and declared the explanation out of order.

What reasonable inference or presumption arises from this circumstance? If a quorum had been pres-

ent, it is extremely improbable that the question would have been made by Mr. Dorsey. If a quorum was pres- ent, it is certain that his point would not have been met as it was, but would, on the contrary, have been met by a call of the roll and a showing upon the journal that a quorum was present.

In this connection, it is clear that no ordinary mat- ter of legislation was involved; it was one of extraor- dinary public interest, and we cannot escape the con- clusion from the circumstance above discussed that the reasonable inference arising therefrom is that no quorum was present at the time of this occurrence.

A second fact appearing on the journal is the action of Mr. Speaker Stanton in answering, "Not voting," when the name of each of the thirty-five members was called.

The question arising is: Why did Mr. Speaker Stanton do this? Certainly, not in the exercise of any power or duty conferred on him by the constitution or any statute of the State. Article 2, section 11, of the constitution, enjoins upon the house and senate, re- spectively, the duty of choosing a speaker. His duties and powers are not outlined or defined by the consti- tution. Article 2, section 12, of that instrument pro- vides that each house may determine the rules of its proceedings; but no rule of the house appears to have existed authorizing the speaker to answer for the thir- ty-five members.

The mandate of the constitution in respect of a quo- rum is "not less than two-thirds of all the members to

which each house shall be entitled shall constitute a quorum to do business,'' and the only power possessed by less than that number is to adjourn from day to day, and, if authorized by law, to compel the attendance of absent members. So says article 2, section 11, of the constitution.

Article 2, section 21, of the constitution, enjoins upon each house the duty of keeping a journal, and of recording therein the ''ayes'' and ''noes'' upon the final passage of every bill of a general character, etc. Bill No. 759 was of a general character, a measure of public importance, and of the utmost moment. The duty was laid by the constitution upon the house, and not upon the speaker, to make a journal; and therefore we conclude that the act of the speaker in answering, ''not voting,'' when each name of the thirty-five members was called, amounted to no more in legal effect than the same announcement would have, if made by any other member of the house.

However, since the words appear upon the journal and must be given due weight as the words of the house used in its journal, we will proceed to consider what effect these words ''not voting'' are entitled to in the construction of the journal. In other words, do they import or imply the presence or the absence of a quorum? The most evident meaning of the words ''not voting,'' and in fact the only evident meaning they can be said to have, is that each of the thirty-five members, when his name was called from the roll, did not

129 Tenn. 13

vote. It is, however, insisted that a presumption may be said to arise from these words that each of them was present, though not voting. The only basis for such a presumption is the legal duty resting upon each of the thirty-five members to be present; but, whatever force this presumption may be entitled to, we think is overthrown by the legal duty resting on each of the thirty-five members, if present, to answer when his name was called and to vote *pro* or *con,* or to announce for himself that he was not voting, to the end that, by his vote or his announcement that he was not voting, it might at least appear upon the journal that he was present, and that it might appear from the journal whether the house was proceeding in its business with or without the presence of a quorum. A further reasonable presumption arises that each of the thirty-five members, if present, would have answered for himself in the representation of his constituency. So we think the presumption based upon his duty to be present is met and overthrown by the conflicting stronger' presumptions above set out.

It is, to be sure, possible that each of the thirty-five members was present and sat mute, and heard the answer of the speaker for him; but this possibility does not, in our opinion, rise to the dignity of a legal presumption upon which this court is authorized to act, for this possibility is opposed by a presumption of undoubted weight, to wit, that if each of the thirty-five members had been present and had sat mute, and had heard the speaker answer for him, the answer of

the speaker would have been, "Present and not voting," instead of the words he used, "Not voting."

So, upon the whole, we think that, giving the journal the full weight to which it is entitled upon its face, and giving it the benefit of every reasonable presumption arising from its recitals, and from its character, it does not show the presence of a quorum.

But what we have said is not all that may be said respecting the journal of April 3, 1913, and the insistence that it discloses a quorum present when action was had on House Bill 759. It remains to be noted that what occurred on that day was not all that transpired in the house on the subject of the passage of that bill, notwithstanding the objections of the governor; for, although the bill after the action shown by the journal was transmitted to the senate on April 3, 1913, and by that body on that day passed, notwithstanding the objections of the governor, and thence passed into the custody of the secretary of state for enrollment as a law, yet on June 21, 1913, a copy of House Bill No. 759 was again read in the house, and put upon its passage notwithstanding the objections of the governor. The vote as recorded on the House journal of that day showed fifty-three members voting, "Aye," and eighteen members voting, "No." Thus, the journal of that vote shows seventy-one members present and voting upon the roll call. Here is a showing by the journal of more than a quorum of the members of the house voting a second time to pass

the same bill notwithstanding the objections of the governor.

The question arises: Why was this done? The journal of the house of that day affords an answer. It shows that a copy of the bill was read, attached to which were the certificates of the respective speakers of the house and senate that the bill had been passed in each of those houses, notwithstanding the objections of the executive, on April 3, 1913, and then it recites: "Whereas, it has been objected by the governor and others that the bill did not pass the house for the alleged reason that less than the number of members necessary to be present to enact laws was then present; and whereas, in view of the public nature and the importance of the bill, all matters of controversy as to its enactment should be determined: Now, therefore, the said bill is hereby repassed, the governor's veto notwithstanding." Then follows on the journal the record of the vote, as already stated.

From the quotation above, the pith and substance of the reason given for again passing the bill over the veto of the governor was that it had been objected by the governor and others that the bill had not passed the house on April 3d, because less than a quorum of members was present on that day. The only reasonable presumption which can arise from this extraordinary action on the part of the house is that the house knew that the objections made by the governor and others above stated were well founded in fact.

Under article 3, sec. 18, of the constitution, after House Bill 759 was disapproved by the governor, and returned with his objections to the house of representatives in which it originated, it could not become a law until passed notwithstanding the objections of the governor first in the house where it originated and next in the senate. It is clear that it did not pass the house over the objections of the governor on April 3, 1913, for the reason, as we think, that the journal of the proceedings of the house on that day not only fail to show the presence of a quorum, but, on the contrary, show that a quorum was not present. This result is reached by the process of eliminating the recital of the journal in respect of the thirty-five members. By the process of elimination, we mean that no reasonable presumption arises from the recitals of the journal in respect of the presence of the thiry-five members which is not met and overthrown by stronger presumptions to the contrary; and that, recital of the journal being thus eliminated, the journal is left standing with the affirmative showing that fifty-eight members, and no more, were present.

On the senate journal of April 3, 1913, it appears that House Bill No. 759 was transmitted to the senate by the clerk of the house together with the veto message of the governor; whereupon, Mr. Crawford made the point of order that the senate had no right or authority under the laws or constitution to receive any matter whatsoever transmitted from the house for the reason that there was not, and had not been, a con-

stitutional quorum of the house of representatives since March, 1913; which point of order the speaker of the senate declared to be not well taken. There-upon it was moved by Mr. Stewart that the bill be passed, the governor's veto to the contrary notwith-standing; whereupon, a copy of the governor's veto of the bill was read. Mr. Williams then made the point of order that the paper purporting to be the veto of the governor was only a copy and not the paper re-quired by the constitution. The speaker declared this point of order not well taken; and thereupon the bill was put on its passage, notwithstanding the veto of the governor, resulting in a vote which the journal shows to have been seventeen "ayes" and fifteen "noes." The names of each senator voting, "Aye," and of each senator voting, "No," are shown upon the journal. Thereupon the journal shows explanations of votes by members of the senate on House Bill No. 759.

One of the explanations is signed by seven senators, and it recites in substance that those senators voted, "no," for the reason that the house transmitting the bill to the senate was doing business without a quorum. Sen. Thomas offered an explanation of his vote against the passage of the bill over the veto of the governor to the effect that it was a matter of such common and public knowledge that no quorum existed in the house at the time of the passage of the bill over the veto of the governor by that body that the fact could not be ignored by the senate, and in his explanation he set out the names of thirty-nine members of the house,

and stated that those members of the house had been absent from the house from and including Tuesday, the 1st day of April, and that this fact was a matter of public knowledge, known to the house and to the senate, but concealed on the house record; and that it therefore followed that House Bill No. 759 had not by the house been constitutionally passed over the governor's veto.

Prior to all we have above stated in connection with the passage of House Bill No. 759 by the senate on April 3, 1913, over the veto of the governor, the journal shows that Sens. Underwood and Williams jointly made a parliamentary inquiry of the speaker of the senate. By this inquiry, those members stated to the speaker, in substance, that they were informed that there was no quorum in the house for the transaction of business, as required by the constitution, and that portion of the constitution relative to the number of members necessary to constitute a quorum was quoted in the inquiry; and the members making the inquiry requested the speaker of the senate to communicate with the speaker of the house, and to ascertain if there was a quorum of the house present for the transaction of legislative business, and that the speaker of the senate inform the senate as to the result of that inquiry.

There was also presented to the senate prior to its consideration of House Bill 759, as shown by the senate journal of April 3, 1913, a message of the governor of the State, by which the governor informed the sen-

ate that the house had that day undertaken to pass over the veto of the governor House Bills numbered 751 and 759, and the governor officially notified the senate by that message that said bills were passed without the presence of a constitutional quorum. The governor then proceeds to set out the names of the representatives who were not present upon the reconsideration of the bill in the house. And his message recited that all of the representatives named had been absent from the house from, and including, Tuesday, April 1st, and that the fact of their absence was a matter of public knowledge, known to the house and to the senate, but concealed upon the house record; and that it therefore followed that said bills had not been as a matter of fact passed over the governor's veto by the house. This message of the governor was presented to the senate by Messrs. Underwood, Morrell, and Butler, members of the senate, as explanation of their reason for voting, "No," to the passage of House Bill No. 751, which was called up for reconsideration in the senate prior to its reconsideration of House Bill 759, on April 3, 1913.

If. as we have held, the journal of the house of April 3, 1913, showed no quorum present in that body upon its reconsideration of House Bill No. 759, then it is clear that the action of the senate was unconstitutional and void in reconsidering the bill; the same having originated in the house and not having there been reconsidered as required by the constitution in order to pass the same over the veto of the governor. And the

action of the senate being for the above reason void, it cannot be considered for any purpose in any judicial inquiry where the purpose is to determine whether or no the act was passed as required by the constitution, notwithstanding the veto of the governor.

It is admitted that no consideration of House Bill 759 was ever had in the senate after the second consideration of that bill in the house of representatives, which occurred, as we have already stated, on June 21, 1913.

We think it clear that the purpose of the constitutional requirement that the journal should show the "ayes" and "noes" upon the reconsideration of a bill for passage over the veto of the governor was twofold: First, that it might thereby appear that a majority of all the members elected to that house had agreed to pass the bill over the veto; second, that it might appear from the "ayes" and "noes" that when the vote was taken a quorum was present. We cannot describe to the framers of the constitution less than these two purposes.

We hold that "ayes" and "noes" were not taken on April 3, 1913, within the meaning of the constitution, as to thirty-five of the members of the house. It was by no means a compliance to show that thirty-five members were not voting without also showing whether they were present or absent.

The result of this construction is the conclusion that the constitution requires the journal to show the presence of a quorum when such vote is taken; and this

showing must be an affirmative one, and not one arising merely by presumption from some fact appearing on the journal, or from silence of the journal on the point, or from a state of facts set out on the journal which leaves the matter in doubt. It is true that our cases from which we have quoted, have settled the rule to be different from that above stated in cases where certain of the requirements of section 18, art. 2, are involved; but the rule which applies in those cases rests upon the reason that the latter section does not require the journal to show that certain of its requirements have been complied with. No such reason can exist, however, in respect of the requirement of section 18, art. 3, that the journal show the "ayes" and "noes"; that requirement is mandatory, and the result of its nonobservance is the invalidity of the act.

In *Williams* v. *State,* supra, from which we have quoted, the above principle was recognized; and, paraphrased, what is quoted therefrom amounts to this: That, where the constitution expressly requires the fact to appear on the journal, mere silence on the point is fatal. There, the question was whether the bill on its third reading received the constitutional majority. It will not be presumed in any case from the mere silence of the journals that either house has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless where the constitution has expressly required the journals to show the action taken, as for instance

where it requires the "ayes" and "noes" to be entered. Cooley, Constitutional Limitations, 195.

There was no such connection between the reconsideration of Bill 759 in the senate on April 3, 1913, and the reconsideration of that bill by the house of June 21, 1913, as to be a compliance with article 3, sec. 18, of the constitution. Neither this court nor the legislature was authorized to change the order which the constitution prescribed, as that its framers thought best. We are not authorized to hold that order directory; the constitution says it shall be done in a certain order. If we essay to change that order, there is no limit to what may follow. No more mandatory words could be used than are employed in fixing the order in which bills must be reconsidered by that section.

In the construction of constitutions, it has been said: "The great majority of all constitutional provisions are mandatory, and it is only such provisions as from the language used in connection with the business in view may be said to be addressed to some person or department that courts have held to be directory; and these provisions in most cases have been those addressed to the legislative department with reference to the mode of procedure in the enactment of laws as above stated. But provisions of this kind will be treated as mandatory if the language used justifies it, even though the proceedings to which they refer are but formal. Whatever is prohibited or positively enjoined must be obeyed. Therefore all prohibitions

and restrictions are necessarily mandatory. So, also, all provisions that designate in express terms the time or manner of doing particular acts, and are silent as to performance in any other manner, are mandatory, and must be followed." Cyc. vol. 8, p. 762.

In *State* v. *McCann*, 72 Tenn. (4 Lea), 11, this court, quoting from Judge Cooley in his work on Constitutional Limitations, said: "For the will of the people, as declared in the constitution, is the final law; and the will of the legislature is only law when it is in harmony with, or at least not opposed to, that controlling instrument which governs the legislative body equally with the private citizen. . . . To say a provision is directory seems, with many persons, to be equivalent to saying that it is not a law at all. That this ought not to be so must be conceded; that it is so, we have abundant reason and good authority for saying. . . . A constitutional provision, if it is to be enforced at all, must be treated as mandatory; and, if the legislature habitually disregards it, it seems to us that there is all the more urgent necessity that the courts should enforce it."

This court, following the above quotation in that opinion, added: "These are words of wisdom from the pen of the ablest constitutional jurist now in our midst, and well deserve to be pondered by those whose duty it is to administer the law and enforce its mandates, especially in the court of last resort."

Delicate, indeed, is the duty, and important the power which rests upon this court whenever called on

to pass judgment upon the validity of an act of a co-ordinate department of the government of the State.

The exercise of such a judgment in its results may be large in good or evil. The law which stands above the three co-ordinate departments of the government and over-shadows all is the constitution; to its man-dates, all must bow. Its command by the use of the word "shall" in prescribing the exact and formal procedure to be pursued when a bill has been dis-approved by the governor excludes the idea that any other order of procedure may be recognized as a com-pliance with its terms. There is no room for the ex-ercise of discretion by those agencies of the State to which it intrusted the execution of section 18 of article 3. The acts to be done by the chief of the executive department, and by that house of the general assembly in which the bill originated, and by the other house, are each and all laid down with specific attention to detail. It is easy enough to say that some other mode of procedure would have done as well, but it is not possible to conceive that any variation from the plain and simple form of procedure laid down with such ex-actness was intended. In such a case, no one of the three departments of the government can do aught but obey. Over the other two departments of the state government, this court of last resort is set to check and declare void any of their acts which, by appropriate proceedings, are brought to its bar for judgment. The result of such judgments, in so far as they affect the interests of the parties to the particular

cause, are of minor importance, as compared with such results in so far as they affect the welfare of the State. If the mandatory provisions of the supreme law here involved should by us be held directory or discretionary, if we by our judgment say that this legislature in that order of reconsideration which it employed in this case found a way in substance the same or just as good and not materially different from that prescribed by the constitution, or that common sense or any other consideration should move us to construe the mandate of the constitution prescribing the particular order designated to mean some other order, then where does such a judgment lead? Clearly, it would be but a step or precedent toward a nullification of any other mandatory provision which may be brought in judgment, and against which some plausible argument may be leveled. By maintenance of the fundamental law of the land are the rights and liberties of citizens of all governments, founded on the will of the governed, preserved; and by judgments reckless of the sacred or mandatory provisions of that law, such rights and liberties are ultimately destroyed.

Among our adjudicated cases, we find no precedent to which we can point as authority for holding the constitutional mode of procedure laid down in section 18, of article 3, as directory.

Reasons plausible enough may be given for upholding the act of the majority of the general assembly

Webb v. Carter.

in both of the houses composing that body, such as that, if the act be declared void, a minority of that body will have been allowed to defeat the will and judgment of the majority, etc.; but, after all is said that may be said on the line of expediency, the fact stands clearly out that to do the thing expedient is to set aside and hold as directory only, a clearly mandatory constitutional provision, and that a multiplication of such precedents must and can only result in in a destruction of the basic law of the State. Where such a condition exists, the duty of this court is to uphold, by its judgment, the fundamental law of the State.

The argument that the reconsideration of the bill by the house of representatives on June 21, 1913, may be treated as a ratification of what the journal shows was done on April 3, 1913, by members of the house amounting in number to less than a quorum for the transaction of legislative business, is, while plausible, we think wholly unsound. There was no house present on April 3, 1913, capable under the constitution of transacting legislative business. The only power possessed by those members of the legislature who undertook to make the journal show a reconsideration of House Bill 759 was to adjourn the house to the following day, or, if authorized by law, to compel the attendance of absent members. And being wholly without power to reconsider the bill and pass the same over the governor's veto, the action of that body was void in law. It was as a thing not done at all, and not

an act defectively performed by a body possessing the power and the right to perform it perfectly; and therefore there was nothing upon which the doctrine of ratification could operate. And our cases (*Furnace Co.* v. *Railroad Co.*, 113 Tenn. [5 Cates], 731, 87 S. W., 1016; *Shields* v. *Land* Co., 94 Tenn. [10 Pickle], 123, 28 S. W., 668, 26 L. R. A., 509, 45 Am. St. Rep., 700; *Muse* v. *Lexington,* 110 Tenn. [2 Cates], 655, 76 S. W., 481) do not apply.

For the reasons above stated, we hold that House Bill No. 759 never became a law, and that chapter 37 of the Public Acts of 1913, as published, is unconstitutional and void.

MR. CHIEF JUSTICE NEIL delivered a concurring opinion as follows: The first question in these cases is whether there was a quorum in the house on April 3, 1913.

Our constitution (article 2, sec. 11) provides: "The senate and house of representatives, when assembled, shall each choose a Speaker and its other officers; be judges of the qualifications and election of its members, and sit upon its own adjournments from day to day. Not less than two-thirds of all the members to which each house shall be entitled . . . shall constitute a quorum to do business; but a smaller number may adjourn from day to day, and may be authorized, by law, to compel the attendance of absent members."

In my judgment, this can mean nothing else than that two-thirds of the number to which each house is entitled are necessary to make a quorum; and that a less number can transact no business except to adjourn from day to day until a quorum shall assemble; there being no law in existence authorizing the body assembled, being less than a quorum, to compel the attendance of absent members.

That two-thirds are necessary to make a quorum is not only clear from the language quoted, but this construction is made stronger even by the fact that both of the prior constitutions, those of 1796 (article 1, sec. 8) and 1834 (article 2, sec. 11), phrased the matter thus: "Two-thirds of each house shall constitute a quorum to do business." It is perceived the present constitution changed this language into "not less than two-thirds," etc. It is also noted that the language "of each house" is changed into "of all the members to which each house shall be entitled." It is apparent, by comparing the three instruments, that the two prior constitutions were before the convention of 1870, and were examined at every step; and their language was, in many instances, adopted. The change from that language to the language used in the present constitution shows how solicitous the convention was to place beyond controversy the requirement that two-thirds should be necessary to make a quorum.

It is insisted that this requirement was not mandatory, but merely directory, in view of the fact that it

is provided in section 18 of the same article that in order to become a law every bill must, upon its third reading, receive, in each house, "the assent of a majority of all the members to which that house shall be entitled under this constitution"; and that a similar provision occurs in article 3, sec. 18, respecting the passage of a bill over the governor's veto. Article 2, sec. 5, provides that the membership of the house of representatives shall never exceed nighty-nine, and this is the number which now composes that house. Sixty-six members are required to constitute a quorum, but under article 2, sec. 18, and article 3, sec. 18, a majority of this quorum cannot pass any bill, and make it a law; but, in order to effect this result, a majority of all of the members to which each house is entitled must vote for it. It is urged that the real, effective body, therefore, is the majority of each house voting for a bill. In view of the specific terms in which the quorum was provided for, it is a singular thing, it is true, that a majority of the quorum was not permitted to control, and that control was vested in the majority of the whole membership. I cannot say, however, that this would evince a purpose to make the provisions concerning the quorum merely directory. Rather, the two provisions indicate a sedulous purpose on the part of the convention, and of the people ratifying the constitution, that all legislative business should receive the careful attention of at least two-thirds of the membership of each house. To secure

that attention, it was required that two-thirds should at all times be present, and that of these, in case only that many should be present, a number equal to a majority of the whole membership of each house should vote for a bill before its passage could be effected. I do not think it can be gainsaid that the two requirements acting together would be more likely to secure an efficient execution of the business of the legislature, than if either were omitted. It is true that those in excess of the majority of the whole membership can have no effect, by their votes, as against that majority; but, pending the consideration of all legislation, it is furthermore true that, by the presence of the large number required to make a quorum, the constituents of all of the members will have the benefit of the consideration which the large quorum could give, a consideration necessarily superior to that which could be given by a smaller number, because the larger number represents a wider experience, and a wider range of views. This is all I deem it necessary to say at this time on the subject of directory and mandatory provisions in the constitution. Further along in this opinion I shall state my views on the general subject a little more at length.

Was there a quorum in the house on April 3d?

The journal of the House on that day, at the time Bill 759 purports to have been passed, shows the following:

"Mr. Cox made the following motion: Mr. Speaker, I move that House Bill No. 759 be passed, notwith-standing the objections of the executive.

"On request of Mr. Thompson, House Bill No. 759 was read by the clerk.

"On request of Mr. Todd, the message of the governor vetoing House Bill No. 759 was read by the clerk.

"Thereupon the roll was called upon the adoption of the motion of Mr. Cox, with the following result:

"Representatives voting aye were: Messrs. Acree, Babb, Barnett, Bejach, Boyer, Bryant, Byron, Cardwell, Chamlee, Cochran, Collier of Humphreys, Collier of Summer, Cox, Davis, Drane, Dunn, Emmons, Gilbert, Greene, Hill, Hunt, Johnson of Madison, Johnson of Shelby, Kirkpatrick, Larsen, Lefever, Link, Love, Malone, Matthews, Mayes, McCormick, McDade, McFarland, Miller of Marshall, Moore, Morris, Murphy, Myers, Nichols, O'Brien, Quenichet, Royston, Schmittou, Shaw, Stone of Cheatham, Taylor of Madison, Todd, Weldon, Wilson, Winchester, and Mr. Speaker Stanton—52.

"Representatives voting no were: Messrs. Dorsey, Fuller, Miller of Lauderdale, and Thompson—4.

"When the name of each of the following repre-sentatives was called, Mr. Speaker Stanton answered for each, 'Not voting': Messrs. Abernathy, Albright, Bullard, Campbell, Childs, Creswell, Denton, Duncan,

Emert, Fisher Fleeman, Fox, Gallagher, Harpole, Hughes, Koffman, Mitchell, Mullens, Park, Parkes, Pierce, Raulston, Rickman, Riggins, Roberts, Robinson, Scott, Smith, Stephenson, Stone of Lincoln, Spears, Testerman, Walker, West, Williamson—35.

"Representatives answering, 'Present but not voting,' were: Messrs. McWherter and Taylor of Jefferson—2.

"When the name of Mr. Dorsey was called he voted, 'No.' and offered an explanation, which was sent to the desk, and on request of Mr. Cox the clerk proceeded to read the explanation.

"The reading of the explanation was interrupted by Mr. Cox, who made the point of order that the question of a quorum could not be determined except by a roll call.

"Mr. Speaker Stanton ruled the point of order well taken, and declared the explanation out of order.

"Mr. McWherter answered, 'Present but not voting,' and offered an explanation.

"Mr. Speaker Stanton ruled the explanation out of order.

"Mr. Thompson offered the following explanation, which was declared in order by Mr. Speaker Stanton:

"Mr. Speaker, I vote no on the motion to pass House Bill No. 759 over the veto of the governor notwithstanding, for the reason that the Republicans, or the minority party, is not permitted in this bill to name their choice on the board, and for the reason I am

pledged to the maintenance of the present election law.
J. R. Thompson.

"Mr. Todd made the following motion: Mr. Speaker, I move you that, whereas, House Bill No. 759 has passed the house, the objections or veto of the executive to the contrary notwithstanding, that the clerk be instructed by the house to transmit said bill to the senate, together with the governor's veto message, as having passed the house, the veto or objections of the executive to the contrary notwithstanding.

"The motion prevailed."

What weight should be accorded the journal? What authority, under the constitution, has the judicial department of our State government in respect of such a matter?

When called upon to accredit any apparent act of the legislature, we should feel sure it is indeed such an act. There is no duty to obey an act which is not genuine. If we find it in the book of the acts for the current legislative year published by authority, we should always, nothing else appearing, give it due credit. But recognizing the right, accorded by our constitutional law, to parties litigant to question whether such supposed act really passed the legislative bodies, we should always, when such question is made, examine the legislative journals to solve the doubt so raised. If the point made be that one of the houses was not duly organized, on a given day, we will examine that point in the light of the evidence which

our law justifies. We will examine the journals. But right here it seems to me that a very important dis-tinction arises. It is this. Where there is no question that the body making the journal is composed of a quorum, capable of legislating, the language of the journal made by it should be given the benefit of every reasonable doubt as to things done, or attempted to be done, in such houses, in the passage of bills, or other acts done in course of legislation, or in the pro-gress of the two bodies towards legislation; and even silence on the part of the journal should not be count-ed against it as to any particular thing, but every pre-sumption should be in favor of regularity, and, if pos-sible apparent omissions should be supplied by inferen-ces from those things which appear. In short, in such a case the journals must affirmatively show some con-stitutional defect in the manner of the legislation. Such is the effect of our decisions. *Brewer* v. *State,* 86 Tenn., 732, 737, 9 S. W., 166; *State* v. *Algood,* 87 Tenn., 163, 168, 10 S. W., 310; *Nelson* v. *Haywood Co.,* 91 Tenn., 596, 604, 20 S. W., 1; *State* v. *McConnell,* 3 Lea, 333; *Williams* v. *State,* 6 Lea, 553; *State, ex rel.,* v. *Baseball Club,* 127 Tenn., 309, 154 S. W., 1151, and cases cited; *Telegraph Co.* v. *Nashville,* 118 Tenn., 1, 101 S. W., 770, 11 Ann. Cas., 824, and cases cited; *State* v. *Swiggart,* 118, Tenn., 556, 102 S. W., 75, and cases cited; *Richardson* v. *Young,* 122 Tenn., 565-569, 125 S. W., 664; *Jackson* v. *Manufacturing Co.,* 124 Tenn., 424-425, 137 S. W., 757. But in none of these cases

was any question made as to the existence of a quorum in the legislature at the time a bill was passed. It is manifest that this high grade as evidence should not be accorded to the journal of a body challenged as not duly constituted for want of a quorum. When the body is in this nascent form, it has, under our constitution, no right except to adjourn from day to day, and wait the coming of a quorum. To say that a body challenged as being in this incomplete form should have accorded to its record all of the presumptions attaching duly to a constituted body is tantamount to cutting off all inquiry, and so saying that any number of persons elected to membership in a legislative body (if at the beginning of the legislative term there has been effected an organization, with a speaker and clerk) may, on any day subsequent to the original organization, assemble with the speaker and clerk, at the ascertained place, and assume to be a quorum, and by such mere assumption prevent all investigation of their claims. Such assupmtion is but saying, in another form, "We who are assembled here claim to be a quorum, therefore we are a quorum." If such assumption could ever be indulged under our constitution, there would be no need for the provision that, when a number less than a quorum are present, they have the right to "adjourn from day to day, and may be authorized by law, to compel the attendance of absent members." Even a majority of one of the houses has no power to declare a quorum when none exists. A quorum is de-

termined by a call of the roll. It is not a matter of judgment, or one requiring a technical decision. An assumption by a majority, or even a distinct declaration that it is two-thirds of the whole, or a quorum, cannot make it so. It is true that where one of the houses assumes that a quorum is present (in cases where the constitution does not require the ayes and noes to be entered on the journals), and proceeds with business on that assumption, unchallenged, the court will be bound to indulge the same presumption; but that will not prevent the ascertainment of the real facts, on proper evidence. The nature of that evidence has been already indicated. Whether there can be any other, or whether lapse of time, even a comparatively brief time, with the journal remaining unquestioned, would so obscure all the sources of knowledge as to render practically impossible all reasonable inquiry into such a matter, need not now be considered. Obviously the doings of a body challenged at the time as not being a quorum must be closely examined, with a view to fair, just, and reasonable interpretation. If, in the previous history of the body during the legislative term, as shown by the journal, the custom, as alleged in the bill in this case, had been each day up to March 28th, when an adjournment to April 1st was taken, to call the roll for the purpose of ascertaining the existence of a quorum, and on the special day in question the roll was not called, this fact would immediately arrest the attention of any

investigator. But if no question was made at the time
by anyone, and the body proceeded as if complete,
nothing else appearing, there would be ground for in-
ferring, and the presumption would be, that the pres-
ence of a quorum had been ascertained in some other
manner, and existed. But if we find, as appears in
the case before us, that some member of the body, in
the exercise of his constitutional right, attempted to
make the question of no quorum, and to have it en-
tered on the journal, as his objection, or protest under
the constitution, and that this was refused, and sup-
pressed, and instead of calling the roll, and ascertain-
ing the fact, in this simple way, all investigation was
cut off, and the body proceeded as if a quorum was
present, and attempted to show that enough members
were present to make a quorum by the mere fact of
the speaker's "answering for" such and such mem-
bers, when their names were called on the ayes and
noes in the passage of a bill saying simply, "Not vot-
ing"—there can be no doubt that such a so-called
journal discredits itself. Here we have, without any
reason apparent except to make the semblance of a
quorum, the violation of a daily practice of calling the
roll, the suppression of all inquiry, as to the existence
of a quorum, and the speaker, without venturing to
name them as "present," simply announcing, "Not
voting," when the names of thirty-five members were
called. We can give no credence to such a record. It not
only fails to show a quorum present, but furnishes a

·convicting basis for the conclusion that there was no ·quorum. The concurrence of all of these facts is consistent with no other conclusion.

I do not doubt that either of our legislative chambers would have the right to pass a rule giving the ·speaker power to note the presence of members actually present, but not answering to their names. This is fully established by the reasoning in the case of *United States* v. *Ballin,* 144 U. S., 1, 12 Sup. Ct., 507, 36 L. Ed., :321.

Whether the speaker, without such rule, would have the power, is another question. The constitution does not prescribe what the power of the speaker should be. It must therefore be true that, being a servant of the house over which he presides, he can have only such power as it confers on him, and may have all such powers as may be thus conferred, not in violation of some provision of the constitution. It may also be laid down as true that where there is no rule ·conferring a power exercised by the speaker, in a given instance, but a duly constituted house submits to the exercise of a power by him, that power must be held to have been rightly exercised, if not in violation of some provision of the constitution.

But it is obvious that this principle could not obtain or hold good where there was no previous rule ·conferring the power, and it does not appear that the house was at the time duly organized so as to confer the power by its acquiescence. In brief, such a power

could not exist for the purpose of organizing the house, in the absence of a rule, or for the purpose of ascertaining a quorum at any time in the absence of such rule. And for this good reason: We cannot assume in any given case that members are present and will not answer, because the contrary presumption in favor of duty must prevail, in favor of all members. If this presumption is to be overturned by the decision of one man, he must have that great power conferred on him from some source, power to witness conclusively the presence and the failure of duty. That power can be conferred upon that single person only by the houses. It might be conferred on the clerk, or on any other person, but it could not exist without being so conferred.

The power, it is observed, is to note the presence of one who is actually present but who does not answer to his name. Suppose a rule should be passed attempting to confer upon the speaker the power to declare a quorum by simply calling the names of members and noting them as "not voting," without regard to whether they were present or absent. I think that such a rule would be unconstitutional, as putting it within the power of the speaker to declare a quorum when none existed, and thus giving over legislative power to a number of members less than that prescribed by the constitution. *A fortiori*, the mere act of the speaker in having certain names called, and noting the persons bearing those names simply as not

voting, could not be held equivalent to "present and not voting," or to an announcement that these persons were present but were not voting. *State, ex rel.,* v. *Ellington,* 117 N. C., 158, 23 S. E., 250, 30 L. R. A., 532, 53 Am. St. Rep., 580.

I am of the opinion therefore that the journal shows that no quorum was present on April 3d.

The next question arises on the action of the house on June 21st.

Bill 759 was passed on March 27th by the house, was transmitted to the senate and passed in that body, and was thence transmitted to the governor of the State for his signature. On April 1st, Gov. Hooper vetoed the bill, transmitting it with his veto message to the house of representatives, in which body it had originated. On April 3d, when no quorum was present, the house undertook to pass the bill over the governor's veto and, assuming that this had been accomplished, transmitted the bill to the senate, and it was there passed and then transmitted by the latter body to the secretary of state for enrollment, as a law of the State.

Subsequently the bill of *Webb* v. *Carter* was filed attacking the constitutionality of the action of the two bodies on April 3d, on the ground that no quorum was in the house when the bill was passed over the governor's veto in the latter body.

After this, the action of June 21st was taken, which is thus evidenced by a copy of the journal of the house of that date:

"Mr. Cox sent a written statement to the clerk's desk, and upon request of Mr. Cox the clerk read the motion, and the bill as therein set out, as follows:

"Mr. Speaker:

"I move the following procedure of the house:

"Whereas the bill known as 'House Bill No. 759,' which is as follows:" (Here followed a copy of the bill in full) "was passed by this house on the third day of April, 1913, the governor's veto notwithstanding; and

"Whereas, it has been objected by the governor and others that the bill did not pass the house for the alleged reason that less than the number of members necessary to be present to enact bills were then present; and

"Whereas, in view of the public nature and the importance of this bill all matters of controversy as to its enactment should be determined:

"Now, therefore, the said bill is hereby repassed, the governor's veto notwithstanding (here result of vote), and it is ordered that the clerk of the house transmit to the secretary of State a duly certified copy of these proceedings.

"Mr. Cox moved the previous question.

"The motion prevailed.

"Thereupon the clerk called the roll on the adoption of the motion of Mr. Cox, with the following result:"

Then followed the names of fifty-three representatives voting, "Aye," and eighteen voting, "No."

It is perceived that a copy of the proceedings was directed to be sent to the secretary of State, and it is not directed that the bill should be transmitted to the senate, nor does it appear that the bill was thereafter so transmitted.  From the fact that a copy of the proceedings was thus ordered to be transmitted to the secretary of State, that nothing is said about transmitting the bill, and from the further fact that Bill No. 759 appears in the published acts as chapter No. 37, and as passed on April 3, 1913, in both houses, we think the inference is irresistible that the house was never in actual possession of Bill No. 759 after April 3d, when it was placed in the hands of the senate; that on June 21st it was in the hands of the secretary of State; and that the house, on June 21st, acted only on a copy of the bill which had been procured, or was in possession of some member of the house.  No other conclusion will fit all of the facts stated.

However, I shall consider the question on the assumption that the bill was itself in the house on June 21st; that although on April 3d it had been bodily, though illegally, placed in the hands of the senate, and thence in the hands of the secretary of State, it had been procured and had come into the possession of the house, that is, the original bill and not a copy merely.

The question to be determined on the basis is whether the due passing of the bill on June 21st could have any effect towards making it a law without its subsequent passage in the senate, on lawful transmission to that body by the house.

In order to make clear my view upon this matter, I shall briefly sketch, in the language of the constitution the course of a bill from its inception through. the two houses to the governor, a veto by the governor, and then the passage of the bill over the governor's veto.

"Constitution, art. 2, sec. 17.

"Bills may originate in either house; but may be amended, altered or rejected by the other.

"Sec. 18. Every bill shall be read once, on three different days, *and be passed each time in the house where it originated, before transmission to the other.*"

This section further provides:

"No bill shall become a law until it shall have been read and passed, on three different days in each house, and shall have received, on its final passage in each house, the assent of a majority of all the members to which that house shall be entitled under this constitution; and shall have been signed by the respective speakers in open session, the fact of such signing to be noted on the journal; and shall have received the approval of the governor, or shall have been otherwise passed under the provisions of this constitution."

"Art. 3, sec. 18. Every bill which may pass both houses of the general assembly, shall before it becomes a law, be presented to the governor for his signature. If he approve, he shall sign it, and the same shall become a law; but if he refuse to sign it, he shall return it with his objections thereto, in writing, to the house

Webb v. Carter.

in which it originated; and said house shall cause said objections to be entered at large upon its journal, and proceed to reconsider the bill. If *after such reconsideration* a majority of all the members elected to that house shall agree to pass the bill, notwithstanding the objections of the executive, *it shall be sent,* with said objections, to the other house by which it shall be likewise reconsidered. If approved by a majority of the whole number elected to that house, it shall become a law. The votes of both houses shall be determined by yeas and nays, and the names of all the members voting for or against the bill shall be entered upon the journal of their respective houses. If the governor shall fail to return any bill, with his objections, within five days (Sundays excepted) after it shall have been presented to him, the same shall become a law without his signature, unless the general assembly, by its adjournment, prevents its return, in which case it shall not become a law.''

It is thus perceived that a bill must originate in one of the houses, must be read and passed on three different days in that house, before its transmission to the other house, must then be transmitted to the other house, where it must go through the same course, must be signed by the respective speakers, must then be transmitted to the governor, must be acted on by his signature, or his retaining the bill without signature for five days, or must be vetoed by him; that, in case of his veto, he must transmit the bill to the house

129 Tenn. 15

wherein it orginated, and must accompany its transmission with his veto message; that the house to which it is so transmitted must enter the governor's veto at large upon its journal, and must again act upon the bill; if that house again pass the bill notwithstanding the veto, the bill then "shall be sent with said objections to the other house, by which it shall be likewise reconsidered." If approved by both houses in this manner, the bill shall then become a law.

It is perceived that the exact sequence of events is laid down in precise terms in the constitution. After the bill was passed on June 21st, as already stated, it was not thereafter transmitted to the senate, nor passed on by the senate; hence, under the terms of the constitution, it could not become a law, since it requires the action of both houses to convert a bill into a law, along with the functions of the governor above indicated.

But it is insisted that inasmuch as there was a quorum in the senate on April 3d, and that body passed the bill by the usual three readings, the absence of a duly constituted house, that is, a house composed of a quorum, to pass the bill on April 3d, could be cured by the action of that body had on June 21st. The position taken, as we understand it, is that the order or sequence of events provided for in the constitution is immaterial, that these provisions are merely directory and not mandatory. The effect of this contention is. that a bill originating in the house may be passed on in the senate before it is voted on in the house, and

vice versa; likewise, that a bill originating in the house, and vetoed by the governor, may be voted on in the senate before it is voted on in the house after such veto.

If a bill must follow the order of progress laid down in the constitution, Bill No. 759 never legally passed out of the control of the house of representatives. That house having no quorum on April 3d had no constitutional power to send the bill to the senate, and the senate had no constitutional power to receive it, hence had no constitutional power to act on it, and hence its attempt to act on that bill was void. The senate having thus obtained possession of the bill without authority of the constitution, and hence in a manner that conferred no jurisdiction upon it, the constitutional custody of the bill remained with the house until June 21, 1913, on which day it was passed by a quorum. It should then, and not until then, have been transmitted to the senate. This was not done, so it remains a bill passed only by one house, the house of representatives.

The foregoing conclusions are sound if it be material that the exact order be followed as laid down in the constitution. If that order can be varied, and if it only be necessary that the bill shall have been passed by both houses over the veto regardless of whether both houses had legal possession of the bill, then it became a law when subsequently passed in the house on June 21st. The question then to be considered is whether the exact order laid down in the constitution is essential.

Is that provision of the constitution directory which declares that when the governor disapproves a bill he shall transmit it to the house in which it originated, and that that house, on passing it `over the veto, shall transmit it to the other house?

If one part is directory, all of the parts are. But the word ''shall'' is used with each step. If the house can constitutionally transmit such a bill to the senate before itself acting on it, or a number of members· less than a quorum can do this, then it seems with equal reason the governor may in his discretion transmit a senate bill with his veto to the house, or a house bill to the senate. Is there any good reason underlying the constitutional order? There is. It is evident that those who originated any legislation in question on any occasion are in the house where the bill was first introduced.     They are more particularly interested than any others in seeing the bill become a law, and are therefore more likely to be vigilant and active in securing its passage over the veto. The great personal interest which a member takes in a bill originated by him, ''his bill,'' is a matter of common knowledge. If the governor can send the bill to the other house, the house in which it did not originate, he can, for a time, at least, stifle this earnest, personal advocacy. The bill may linger in the house to which he has sent it until the ardor of its special advocate cools or dies out. Furthermore, the governor may be stronger in the house to which he has chosen to send it, and his friends there may be able to so obstruct the

bill that it will not be acted on at all during the session, or action on it may be so delayed that, through the intervention of other legislative business, it may reach the other house too late for action there before the close of the session.  The effect of holding constitutional such a course would be to add to the personal power of the governor, and to detract much from the power of the legislature.

View the question from another angle:  Suppose the governor properly transmits a bill with his veto to the house in which it originated, and suppose it is a measure of monmentous importance on which parties are closely divided, and on which popular feeling is running high, and suppose the governor's reasons for the veto are weighty, and evoke strong popular support, and suppose the house in which the bill originated, and to which it had been so returned, wishes to avoid the responsibility of taking the initiative in overriding the veto and thereby repudiating the reasons given in the veto message, which we may suppose as stated, to be very strong and very popular, and from such motives that house wishes to place the responsibility on the other house of acting first.  If the matter is discretionary, as suggested, this could be done.  This would result, if valid, in the imposition by one house on the other of a duty for no other reason than that the first wished to escape the responsibility of performance.  Let us suppose the body so wishing to escape or postpone responsibility is the house.  It avoids the duty and hands it over to the senate, and that body

is called on to act. But that body is co-ordinate and may insist the duty cannot be imposed. It has the power to refuse, and there is no authority known to our system which could compel it to act. Suppose it does refuse. We then have the spectacle of a bill being thrown from one house back to the other, and from that back to the first, and so on indefinitely. On the other hand, if the order laid down in the constitution be binding, there never can be any doubt in any instance as to the duty of each body and the method that should be pursued.

If the constitutional order can be departed from— that is, if it is directory instead of being mandatory— the people can never fix responsibility or impute blame to their legislative representatives, since, if each body has the discretion suggested, no one can say which is in the wrong. Yet the only court of appeal which the body of the people have for the correction of error, or the punishment of faithlessness on the part of their representatives, is the ballot box. But if the courts hold that the criteria of action which the people have prescribed in the constitution are simply directory and may therefore be obeyed or disobeyed as the legislature may see fit, what is there left by which the people can judge their representatives? This consideration is of the greatest importance, because it lies at the very foundation of representative government.

The danger in holding constitutional provisions directory is great, in any instance, but especially so as to those which concern action by the legislature. The

courts, by so doing, can quickly destroy every barrier which the people have erected for their protection against usurpation by the lawmaking body. "One of the first things a student of our system of government learns is that it is a system of checks and balances. One of the principal checks upon legislative power is the authority of the court to enforce obedience to the mandates of the constitution by adjudging void enactments which conflict with its provisions. History proves, and experience demonstrates, the necessity of such a check, for without it the legislative department arrogates to itself every substantial governmental function and power that it can grasp. . . . The change wrought by legislative usurpation and encroachment justifies the statement of Mr. Bagehot that 'a legislative chamber is greedy and covetous. It acquires as much, it concedes as little, as possible. The passions of its members are its rulers; the lawmaking faculty, the most comprehensive of the imperial faculties, is its instrument. It will take the administration if it can take it.' Eng. Const. (Am. Ed.), 95. The great men who framed our constitutional system knew and provided against the dangers of legislative usurpation of power, and the wisest among them united in devising checks upon it. The declarations of Madison and Washington are strong and clear, and no reader of history can misunderstand their meaning, or doubt their purpose. Jefferson thus expressed his conviction: 'An elective despotism was not the government we fought for, but one which should not only be founded

on free principles, but one in which the powers of government should be so divided and balanced among several bodies of magistracy as that no one should transcend their legal limits without being effectually checked and restrained by others.' 'To preserve these checks,' said a greater thinker than Jefferson, 'must be as necessary as to institute them.' Washington's Farewell Address." Elliott, J., in *Parker* v. *State,* 133 Ind., 178, 209, 32 N. E., 836, 845, 18 L. R. A., 578, 579.

I am of the opinion, therefore, that the court should deal most sparingly, and exercise the very greatest caution, in holding any constitutional provision directory.

Such is the rule laid down, in substance, in Black's Constitutional Law, p. 78, where it is said:

"The provisions of a constitution are almost invariably mandatory. It is only in extremely plain cases, or under the pressure of necessity, that they can be construed as merely directory."

In 8 Cyc., p. 762, it is said:

"The great majority of all constitutional provisions are mandatory, and it is only such provisions as from the laguage used in connection with the objects in view may be said to be addressed to the discretion of some person or department that courts have held to be directory, and these provisions in most cases have been those addressed to the legislative department with reference to the mode of procedure as to the enactment of laws as above stated. But provisions of this kind

will be treated as mandatory if the language used jus-
tifies it, even though the proceedings to which they
refer are but formal. Whatever is prohibited or posi-
tively enjoined must be obeyed; therefore all prohibi-
tions and restrictions are necessarily mandatory. So
also all provisions that designate in express terms the
time or manner of doing acts, and are silent as to per-
formance in any other manner, are mandatory and
must be followed."

Judge Cooley, in his work on Consttiutional Limita-
tions (5th Ed.), pp. 93, 94, gives it as his view that the
whole doctrine of directory provisions in a constitution
is inadmissible, using the following language:

"But the courts tread upon very dangerous ground
when they venture to apply the rules which distinguish
directory and mandatory statutes to the provisions of
a constitution. Constitutions do not usually undertake
to prescribe mere rules of proceeding, except when such
rules are looked upon as essential to the thing to be
done; and they must then be regarded in the light of
limitations upon the power to be exercised. It is the
province of an instrument of this solemn and perma-
nent character to establish those fundamental max-
ims, and fix those unvarying rules by which all de-
partments of the government must at all times shape
their conduct; and, if it descends to prescribing mere
rules of order in unessential matters, it is lowering the
proper dignity of such an instrument, and usurping the
proper province of ordinary legislation. We are not
therefore to expect to find in a constitution provisions

which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegates as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themelves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication.''

The author admits that there are a few reported cases to the contrary, and these he discusses in the succeeding pages and expresses the opinion that they are against the weight of authority. He quotes with approval our case of *Cannon* v. *Mathes*, 8 Heisk., 517, wherein Nicholson, C. J., said:

''In the present case, we do not deem it necessary to express an opinion as to the question whether any provision of the constitution can be properly treated otherwise than as mandatory. The essential nature and

object of constitutional law being restrictive upon the powers of the several departments of government, it is difficult to comprehend how its provisions can be regarded as merely directory.''

It is true that in a later case (*Telegraph Co.* v. *Nashville,* 118 Tenn., 1, 101 S. W., 770, 11 Ann. Cas., 824) this court, in an opinion by Mr. Justice Wilkes, did hold a certain provision of the constitution directory; but it is apparent from an examination of the opinion that the court did so only after the most careful scrutiny, and with a full appreciation of the danger attendant upon holding any constitutional provision directory, and in view of the fact that there had been a practical construction of the point by the legislature for a long period during which nearly 200 acts, many of them very important, covered by the provision and practice in question had been passed; and further in view of the fact that an attentive examination of the very language of the constitution in which the subject involved was expressed seemed to clearly indicate that that provision was intended to be directory; and further reinforced by the consideration that a contrary view would place it in the power of a negligent or corrupt clerk of the senate or house, without the knowledge of either, to nullify the most important legislation. It was not deemed that the people in establishing the constitution could have intended to subject legislation to such constant menace of negligence or fraud, on the part of subordinate officers of the body having no part in the making of laws.

The last expression of the court on the subject is found in *State* v. *Burrow,* 119 Tenn., 376, 104 S. W., 526, 14 Ann. Cas., 809. In this case the court quotes with approval the language of Judge Cooley, supra, and lays down the general rule that every provision of the constitution should be held mandatory, and admits an exception to that rule only in the case where it can be ascertained unmistakably and conclusively from the language of such special provision that it was intended to be directory only. The opinion on the subject, delivered by our former chief justice, now United States senator, Shields, is couched in terms so appropriate and so strong that we deem it proper to reproduce his language, in part, at least:

"Constitutions are expressions of the sovereign will of the people, the fountain of all power and authority. The several departments of the government are created and vested with their authority by them, and they must exercise it within the limits and in the manner which they direct. The provisions of these solemn instruments are not advisory, or mere suggestions of what would be fit and proper, but commands which must be obeyed. Presumably they are all mandatory. Certainly no provision will be construed otherwise, unless the intention that it shall be unmistakably and conclusively appears upon its face. The supremacy of and permanency of republics depend upon the maintenance of the fundamental law, in its integrity, as written in constitutions adopted by the people; and it is the solemn duty of all those temporarily vested with

power, in all departments of the State, to do this. The necessities of a particular case will not justify a departure from the organic law. It is by such insidious process and gradual encroachment that constitutional limitations and government by the people are weakened and eventually destroyed. It has been well said:

" 'One step taken by the legislature or judiciary in enlarging the powers of government opens the door for another, which will be sure to follow, and so the process goes on until all respect for the fundamental law is lost, and the powers of government are just what those in authority please to make or call them.' "

It may be useful to quote some observations in point from the decisions of other States.

In *Varney* v. *Justice,* 86 Ky., 596, 601, 6 S. W., 457, 459, it is said:

"Whenever the language (of the constitution) gives a direction as to the manner of exercising a power, it was intended that the power should be exercised in the manner directed, and in no other manner. It is an instrument of words, granting powers, restraining powers, and reserving rights. These words are fundamental words, meaning the thing itself; they breathe no spirit except the spirit to be found in them. To say that these words are directory merely is to license a violation of the instrument every day and every hour."

This language was quoted with approval in the opinion of Bennett, J., in the later case of *Norman* v. *Ken-*

*tucky Board of Managers,* 93 Ky., 537, 20 S. W., 901, 18 L. R. A., 560.

In *Parker* v. *State,* 133 Ind., 178, 196, 32 N. E., 836, 841, 18 L. R. A., 567, 574, it is said:

"Constitutional provisions are seldom, if ever, to be construed as merely directory."

The supreme court of West Virginia said:

"Constitutional provisions are organic. They are adopted with the highest degree of solemnity. They are intended to remain unalterable except by the great body of the people, and are incapable of alteration without great trouble and expense. They are the framework of the State as a civil institution, giving cast and color to all its legislation, jurisprudence, institutions, and social and commercial life by confining the legislature, the executive, and judiciary within prescribed limits. All the great potential, dominating, creative, destroying, and guiding forces of the State are brought within their control so far as they apply. Thus, to the extent of their duration, they define and limit the policy of the State more rigidly and unalterably than the sails and rudder of the ship when set govern and control its course. A more apt figure is made up of the great system of highways, including railroads, fixing the mode, courses, and extent of travel and transportation." *Capito* v. *Topping,* 65 W. Va., 587, 591, 64 S. E., 845, 846, 22 L. R. A. (N. S.), 1091, 1092.

What has been said in the preceding paragraphs, whether by way of reasoning, or in the language of authorities quoted, seems to me to present insuperable

objections to our holding as merely directory the provisions of our constitution referred to.

But I wish to add a few words more. I wish to call special attention to the use of the word ''shall.'' All through the provisions quoted the people of the State in making their constitution use that authoritative and compelling word—a word which leaves no doubt of the purpose of one who uses it, having at the same time power to enforce his will. Thou shalt, and thou shalt not. These are the dominant expressions of a controlling will. It is most interesting, instructive, and impressive to read the constitution through, and note how often the people use therein the expressions we have just referred to—''shall,'' and ''shall not,'' or their equivalents. A few instances will suffice: ''That no political or religious test, other than an oath to support the constitution of the United States and of this State, shall ever be required as a qualification to any office or public trust under this State.'' Article 1, section 4. ''That the right of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors.'' Id., sec. 6. ''That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the facts committed, or to seize any person or persons not named, whose offenses are not particularly described and supported by evidence, are dangerous to liberty, and ought not

to be granted." Id., sec. 7. "That no man shall be taken or imprisoned, or disseised of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land." Id., sec. 8.

But why need I go further, and furnish other examples? It is already perceived that by these words, "shall" and "shall not," the people have endeavored to preserve, and save from harm, their most sacred rights of life, liberty, property, and the pursuit of happiness; that by these they have sought to guard every man from oppression and to guarantee right and justice to all. Can we hold these words as merely directory in the passages we have quoted? If not, what warrant have we that their imperative meaning is lost in subsequent parts of the constitution?

It may be said that the result would have been the same in the present instance, if the constitutional order had been followed, that the senate would have again passed the bill by substantially the same vote as before; therefore that the question is immaterial. Who can say that a change of opinion might not have occurred among the members of the senate? But grant that no change would have occurred, and that the result of another vote would have been the same. Would this be true of every future violation of the constitutional order? It must not be overlooked that we are not only deciding the case before us, but laying down also a rule of constitutional duty to be followed in suc-

ceeding cases, and by the legislature in its future con-
duct. Is it a sound and true principle that the legisla-
ture and this court will be justified in disregarding
a command embraced in the constitution, when we are
satisfied the result will be the same as it would be if
we obeyed it? It is provided in article 1, section 9,
that "in all criminal cases the accused hath the right
to be heard by himself and his counsel." We may con-
ceive a case wherein the accused, though a weak and
ignorant man, employed very able and competent coun-
sel who represented him in the trial court. On his con-
viction and appeal to this court, and error assigned
to the effect, and sustained by the record, that he had
demanded to be heard in person, and this right had
been denied him in the trial court, would this court
consider it a sufficient answer that he was weak and
ignorant, his speech, or talk to the court and jury would
have done him no good, the evidence was conclusive,
and the result would have been the same? Assuredly,
no. The same section provides that the prisoner has
the right to a copy of the indictment. Would a refusal
of this right, on demand from him, be excused in this
court on the ground that it would have done him no
good, that the indictment was read in his presence
when he was put on trial before the jury? This court
has held to the contrary. *Moses* v. *State,* 9 Baxt.,
230; *Nokes* v. *State,* 6 Cold., 297. In the same section
it is provided that the accused has the right to a
"speedy public trial, by an impartial jury of the coun-

129 Tenn. 16

ty in which the crime shall have been committed."
Suppose the trial was had in secret over the prisoner's objection, and his demand for the public trial guaranteed him by the constitution, would this court, for one instant, excuse that denial on the ground that the result would have been the same? Suppose he had been tried by an "impartial jury" of another county than the one in which the crime had been committed, when he had not asked for a change of venue, would this court fail to promptly reverse the judgment? The court has answered this question in no uncertain way. *Kirk* v. *State,* 1 Cold., 344; *State* v. *Donaldson,* 3 Heisk., 48. In article 6, section 12, it is provided that all indictments shall conclude, "against the peace and dignity of the state." Could a failure to so conclude an indictment be excused by us on the ground that it was an immaterial matter, and the result would have been the same? This court has answered, no, that the constitutional provision is imperative, and must be obeyed. *Rice* v. *State,* 3 Heisk., 215, 221. Yet it is difficult to see why the constitution required this language to be used. The same section provides that "all writs and other process shall run in the name of the State of Tennessee." Why could not a case be tried just as well with the writ running in the name of one of the great cities of the State? But this court has said, no, such a writ is void. *Mayor and Aldermen* v. *Pearl,* 11 Humph., 249, 250. Why could it not run in the name of one of the courts of the State? This court has said such a writ is void. *McLendon* v. *State,* 8

Pick. (92 Tenn.), 520, 525, 22 S. W., 200, 21 L. R. A., 738.

What is the principle underlying all of these cases? Simply, that our duty is not to ask the reason why, when the mandate is plain; not to question why another way would not do as well, but simply to obey. As said by Mr. Justice Buchanan, quoting with approval an author mentioned by him: " 'Where the legislature has used words of plain and definite import, it would be very dangerous to put upon them a construction which would amount to holding that the legislature did not mean what it had expressed.' In a recent . . . work on Statutory Law, it is said that the intention of the legislature is to be learned from the words it has used; . . . and, if that intention is expressed in a manner devoid of contradiction and ambiguity, there is no room for interpretation or con struction, and the judges are not at liberty, on consideration of policy or hardship, to depart from the words of the statute; that they have no right to make exceptions or insert qualifications, however abstract justice or the justice of the particular case may seem to require it." *Heiskell* v. *Lowe*, 126 Tenn., 475, 499, 153 S. W., 284, 290.

If this order was immaterial, why was section 18, of article 3, laying down in precise terms what shall be done in case of a veto by the governor, embraced for the first time in the constitution of 1870, when it did not appear in that of 1796, or that of 1834? A comparison of the three instruments shows that the

constitution of 1796 was before the convention of 1834, and that changes and additions were made, matters omitted, and matters added, when the latter constitution was made; likewise it is apparent that both constitutions were before the constitutional convention of 1870, and that other excisions and additions were made. The constitution of 1870 established the new matter covered in article 3, section 18. Can this be regarded as an immaterial circumstance, and the new matter likewise immaterial, to be obeyed or disobeyed as may seem proper or convenient to the legislature? Why was the convention of 1870 at so much pains to add this new matter, after an inspection and comparison of the two former constitutions, if it was to be disregarded at will? By this new matter the governor was for the first time given the veto power. By it that power was regulated, and the action of the legislature in respect thereof as well. One is as imperative as the other. I have shown in a former part of this opinion that there are excellent reasons for the rule of legislative action thus laid down; but, even if there were no such reasons, still it was the simple duty of the legislature to obey the directions given. Having failed to obey the constitution, their act was nugatory, and it is the duty of the court, as I conceive, to so hold and decide.

If I am correct in the proposition that the order of events, the due course of legislation, is essential, the action of the senate on April 3d was, as previously said, void because there had been no previous constitutional

:action in the house, in which the bill originated.   For
.a like reason, the action of the house on June 21st could
not cure the previous void action of the senate, and
could have no effect at all because there was no subse-
,quent action of the senate.   On the same principle, the
.action of the house on June 21st could not relate back
to April 3d so as to make the action of the house in
legal effect antedate .that of 'the senate.   If such fic-
tion of relation should be indulged, it would subvert
the constitutional order as effectually as an open and
.designed effort on the part of the two legislative bodies
to subvert that order.   Such supposed curative action
would as surely violate the constitutional policy as if
there had been no previous attempt in the house.   The
thing to be cured would be the .fact that the senate had
:acted prior to the house; the latter under the constitu-
tion being required to act first.   The cure on the as-
:sumption of relation is to be effected, if at all, by the
house still acting subsequent to the senate, but treat-
ing that action as if it had in fact been prior; in short,
by the operation of a legal fiction.   Constitutional pow-
,ers cannot be so conferred, or exercised.   Again, the
,right of the legislature to pass curative acts is based
,on its authority to enact legislation, to make good now,
by an act of legislation, what it could have made good
prior thereto if called upon, or to correct some defec-
,tive exercise of its own legislative power on some for-
mer occasion; but here, in the special case before us,
the difficulty is not in the exercise of legislative power,
but in the failure to occupy a certain, constitutional.

*status,* the absence of which *status* made the house, at the time, being without a quorum, no legislative body at all. By sustaining the proper *status* at a subsequent time, it could not change the fact that on a former day it did not have that *status,* or supply the lack of that *status.* The power resides in the constitution as an expression of the will of the people, not in the legislature. By having a quorum and being organized, a branch of the legislature stands in such relation to the constitution as that it is a legislative body, and capable of exercising constitutional power. A constitutional status on a subsequent day cannot relate to a former day and ·cure a lack of *status* existing at that time. The body purporting to act on the former day without a quorum was simply no legislative body. Nothing can alter that fact. Such was the assemblage of men purporting to act as the house on April 3d.

Reference is made in the opinion of Mr. Justice Lansden to *Archibald* v. *Clark,* 112 Tenn., 532, 82 S. W., 310. As I understand the reference, it is made for the purpose of showing that the order in which the two houses shall consider a bill is immaterial. In my judgment that case is incapable of that construction, and so are the cases which subsequently cite it with approval. The court was not considering, and did not have in mind, in any degree, the subject which we are now discussing, but only whether the bill, under the practice pursued, had had three readings in each house. It was adjudged that it had, because the same bill had been introduced in each body, had two readings in each, had

a third reading in the house, a transfer then to the senate, and a third reading there. The practice is not a wise one, and is more honored in the breach than in the observance, because it enables the passage of a bill through the two houses during three days' time instead of six; but there is nothing in the constitution that prevents the same bill being introduced simultaneously in the two houses, and thus being at the same time both a house bill and a senate bill. In such a case each house would proceed in the regular course to consider its own bill, but the one first succeeding in passing the bill upon its third reading would transmit its bill to the other house, and it would there be substituted for the bill of that house, and be passed; this passage in such other house being treated as a passage on its third reading in that house because it had already, in the form of a bill of that house, passed two readings. It is perceived that the question is not one of due progression from one house to the other, but only as to whether there had been three readings in each house. The due order of constitutional progression was recognized and followed, on final reading, when the house bill was transmitted to the senate, and was there passed. In such a case the bill is finally treated as a bill originated in the house in which it first passed its third reading. *Archibald* v. *Clark* is therefore not an authority for the proposition that the constitutional order is immaterial, but rather the contrary. The fact that this case is cited for such a purpose emphasizes the danger of departing from con-

stitutional provisions even in appearance, because precedents of this kind may be the fruitful origin of other precedents which will lead us far beyond real constitutional bounds.

For the reasons stated, I am of the opinion that House Bill 759 was never constitutionally passed, and therefore that chapter 37 of the Acts of 1913 is void.

Mr. JUSTICE WILLIAMS delivered a concurring opinion as follows:

My concurrence in holding that article 2, section 11, and article 3, section 18, are mandatory in character is compelled by the reasoning of Mr. Justice Buchanan and the chief justice in the opinions delivered in this case, as well as by the admirable statement of the rule by former Chief Justice Shields in *State* v. *Burrow,* 119 Tenn., 376, 104 S. W., 526, 14 Ann. Cas., 809.

When we view the nature and functions of a constitution, as the expression of the sovereign's will in respect of the legislature and legislation, and as intended not merely to provide for the exigencies of a few years but to endure stably throughout a long period, the limitations imposed by it upon the power of the sovereign's agencies should not be deemed less than mandatory.

Constitutional limitations of this character are of necessity rigid, if they are truly to impose the sovereign's will upon the will of its agents.

The courts in their guardianship of the constitution, should be slow to rule otherwise.

As said by Mr. Justice Lamar, in *Board of Lake Co. v. Rollins,* 130 U. S., 662, 9 Sup. Ct., 651, 32 L. Ed., 1060: ''The liberty of the citizen, and his security in all his rights, in a large degree depend upon a rigid adherence to the provisions of the constitution and the laws, and their faithful performance. If courts, to avoid hardships, may disregard and refuse to enforce their provisions, then the security of the citizen is imperiled. Then the will, it may be the unbridled will, of the judge, would usurp the place of the constitution and the laws, and the violation of one provision is liable to speedily become the precedent for another, perhaps more flagrant, until all constitutional and legal barriers are destroyed, and none are secure in their rights. Nor are we justified in resorting to strained construction or astute interpretation, to avoid the intention of the framers of the constitution. . . . If unwise or hard in their operation, the power that adopted can repeal or amend, and remove the inconvenience.''

If, then, we proceed upon the basis that article 2, section 11, stipulating that ''not less than two-thirds of all members to which each house shall be entitled shall constitute a quorum to do business,'' is mandatory, what weight shall be given, the house journal as evidence of the fact that such quorum was present or lacking on April 3d?

When we look to the journal entries, we find that on previous legislative days in compliance with parliamentary procedure the house had, without varia-

tion, up to April 1st-3d undertaken to ascertain the existence of a quorum or no quorum by roll calls; that, for the first time, on April 1st-3d, it failed to do so, but on the contrary dispensed with the call. Further, that while the form of response, "Present but not voting," was used to indicate the physical presence in the house, but refusal to vote, of two representatives, the form, "Not voting," was used by the speaker in his effort to answer for thirty-five representatives. These two facts in conjunction tend strongly to raise affirmatively a showing of a lack of a quorum.

Yet further: It appears in the journal entry of April 3d that a representative offered an explanation, calling in question the matter of a quorum, and thereupon a point of order was made by another representative to the effect that the question of a quorum could not be determined except by a roll call. This point of order was sustained, and yet no roll call for the ascertainment of a quorum was ordered; and the explanation was denied entry on the journal.

Appellees properly treat of this attempted explanation as an attempted protest. The constitution, art. 2, sec. 27, provides: "Any member of either house of the general assembly shall have the liberty to dissent from and protest against, any act or resolve which he may think injurious to the public or to any individual, and to have reasons for his dissent entered on the journals."

It is insisted in behalf of appellees that "the only protest allowed by the constitutional provision is one

Webb v. Carter.

against a bill or resolution which has passed.'' This is too narrow a view and would unduly restrict the right of protest and postpone it to a time when it would be less availing, if, indeed, not unavailing in instances.

When we consider that this explanation of protest was directed immediately at the lack of a constitutional quorum to proceed to the passage of the bill over the governor's veto, to my mind its suppression by the speaker and the house is pregnant with meaning, especially when viewed in conection with the two facts above commented on. I do not consider that a journal that shows that a protest, thus constitutionally raised to call in question the lack of power on the part of the house, has been stifled, is entitled to be accredited by the courts with verity by way of conclusive presumption of regularity in respect of the presence of a quorum.

If it be said that the journal is otherwise silent touching the presence or absence of quorum, it yet affirmatively appears that a mandatory provision in respect of the right of protest was violated in the suppression of that which tended to impeach the existence of the very thing we are asked to presume. We should refuse to so presume in favor of a body thus proceeding in disregard of a plain constitutional mandate. To do otherwise would be to place it in the power of a speaker and a few members by the fabrication of a journal to create *evidence of power* and then of power exercised in any manner they might will, silencing protest the while.

Manifestly, the journal, under the rule obtaining in this State, comes under review by us as *evidence,* and it is for the court to say what dignity in grade shall be assigned to it as evidence. If those who make such a journal leave upon it marks of manipulation in an effort towards showing apparent power, it is conceived that this should subtract from the dignity otherwise assignable to it, and leave the question open to proof.

What has been said by Mr. Justice Buchanan and the Chief Justice in regard to the effect of the proceedings in the house on June 21st is so comprehensive and convincing as to leave nothing to be here added, further than the statement of my concurrence.

Mr. Justice Lansden delivered a dissenting opinion as follows:

I am unable to concur in the opinions delivered by the majority of the court, and, because of the great importance of the case and the far-reaching effect of the questions decided, I deem it proper to express the grounds of my dissent. I shall only discuss the effect of the action of the two houses when quorums were admittedly present in passing the bills over the governor's veto, pretermitting the other questions made and discussed by counsel. So if it be conceded that there was no quorum present in the house on April 3d, and that the journals so show, it still remains a conceded fact that the senate passed the bill when a quorum was present in that body, and, upon a proper roll call, it received the votes of a majority of all the

members to which that house was entitled. Afterwards it was passed by the house when a quorum was present in that body, receiving on proper roll call the votes of a majority of all the members to which the house was entitled.

As I understand the opinion of the majority, it was decided that the bill in question never became a law, notwithstanding it received the assent of both the house and the senate, for the reason that the two houses did not act in the sequence required by the constitution. Upon the passage of bills over the governor's veto, the constitution (article 3, sec. 18) provides as follows:

"Every bill which may pass both houses of the general assembly, shall before it becomes a law, be presented to the governor for his signature. If he approve, he shall sign it, and the same shall become a law; but if he refuse to sign it, he shall return it with his objections thereto, in writing, to the house in which it originated; and said house shall cause said objections to be entered at large upon its journal, and proceed to reconsider the bill. If after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, notwithstanding the objections of the executive, it shall be sent, with said objections, to the other house, by which it shall be likewise reconsidered. If approved by a majority of the whole number elected to that house, it shall become a law. The votes of both houses shall be determined by yeas and nays, and the names of all members voting for or

against the bill shall be entered upon the journals of their respective houses."

It should be observed that the foregoing provision of the constitution has for its object the passage of bills over the veto of the governor, and states in what event a vetoed bill shall become a law. All of the requirements of the constitution in respect thereto have been met by the action of the two houses except that the senate reconsidered the bill and passed it over the veto before it was legally reconsidered and passed in the house.

The governor has no power to defeat legislation. Under the constitutions of 1796 and 1834 he did not have power to even check legislation because the veto was entirely withheld from him. His right of veto originated in our present constitution, and section 18, art. 3, above quoted, relating to the passage of bills over the governor's veto, and the veto itself, are manifestly modeled from section 7 of article 1 of the constitution of the United States with the very important difference that our constitution permits bills to be passed over the veto of the governor by the same number of votes and the votes of the same members who are empowered to pass it originally. In other respects, the language of the two instruments on this subject is strikingly similar. The purpose of these provisions of the constitution manifestly is to require the general assembly to reconsider the proposed legislation upon the objection presented to it by the governor. The governor is authorized to counsel and advise the ma-

jority of the legislature, but he cannot defeat their will. He represents a majority of all the voters of the State acting *en masse*. A majority of the members of the legislature may or may not represent the will of a majority of all the voters of the State, but they do represent a majority of the majorities of certain subdivisions of the State composing the counties and the floterial and senatorial districts from which the members are chosen. So when an issue is joined upon the passage of a bill between the governor opposed and the general assembly in favor of such passage, the constitution requires the general assembly to reconsider the bill in the light of the governor's objections.

From these considerations, I think there can be no doubt but that the meaning and purpose of these provisions of the constitution are to compel the general assembly to receive counsel from the governor and reconsider the bill in view of his specific objections. The procedure by which the reconsideration is to be had and the sequence in which the two houses are to act are merely means to the chief end in view. These purposes of the constitution, and especially the fact that the governor has no power to defeat legislation, should be borne constantly in mind in determining the legal existence of the bill under consideration. This is true because the final question to be decided is whether the governor's veto has defeated this legislation. It inevitably comes to this because the two houses passed the bill and transmitted it to the governor and he vetoed and returned it to the house of its origin. Both

houses have since reconsidered it in the light of his
objections with quorums present and have passed it
over the veto by requisite majorities.

The power of the legislature to enact laws and the
absence of power in the governor to defeat laws are
emphasized here to show that each one of those de-
partments has exercised the full power belonging to
it in respect to this bill, and therefore the power of
both has been exhausted in the effort upon the one hand
to enact the law and upon the other to defeat it.

The balance of the powers given to the different
departments of government must be rigidly main-
tained. It is the duty of this court in construing the
constitution to require a strict adherence of each de-
partment of government to the sphere of action assign-
ed to it by that instrument. A construction cannot
be given it which would enable one department to
exercise a power not conferred or that would enable
it to defeat the exercise of a power by another depart-
ment which is conferred.

If the action of the two houses has failed to result
in the constitutional enactment of the bill, it must be
because of a failure to observe some sequence in their
action made necessary by the constitution. The gen-
eral assembly had the power to pass the bill. It also
had the purpose to do so. The objection taken to the
validity of its action is not to its power to do the thing
attempted, but to the manner, form, and time in which
the thing was done. So it is not a question of the
power of the legislature to do it, but the mode of pro-

cedure by which it attempted to exercise its admitted power. A distinction has always been taken in the construction of the constitution between power and procedure. I believe it has never been held before that an admitted power to do a thing has been defeated by a mere failure to comply with the exact order of. sequence in which it was to be done. No cases are cited for such a holding, and there are numerous cases in our own reports which are to the contrary. The fundamental difference between power and procedure is thus admirably. stated on the brief of learned counsel for appellants:

"This purely American idea, of the courts standing as the final guardians of the constitution, is the crowning glory and excellence of the American system of government, state and national; and yet this system, wise and beneficent as it is, could not endure for a day without a constant recognition of the fundamental difference between power and procedure. If every lapse in the mode or manner of action by the agents of government within the legitimate spheres of their powers operated to defeat such action, the system would lose all efficiency and fall of its own weight—the people would not endure it.

"And, on the other hand, if the same liberality which it is necessary to indulge for practical purposes with respect to the mode and manner of doing things were extended also to the powers and their limitations, then indeed would the constitution become a dead letter,

129 Tenn. 17

and every agent of government be invested with a discretion to do not only as he pleased, but what he pleased; and the whole government become at once, not a government of law, but a government of men. Throughout the whole system, the substance is ever and always to be exalted over mere form.

"And so the courts, from the beginning, in dealing with both constitutions and statutes, have been found constantly recognizing this fundamental distinction between power and the mode of its exercise; treating certain provisions as mandatory, and others as directory; certain things as matters of substance and other things as matters of form."

The language of the constitution pointing out the procedure of the two houses in passing bills over the governor's veto is positive and not negative. It is:

"If he refuse to sign it, he shall return it with his objections thereto, in writing to the house in which it originated; and said house shall cause said objections to be entered at large upon its journal and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, notwithstanding the objections of the executive, it shall be sent with said objections to the other house by which it shall be likewise reconsidered. If approved by a majority of the whole number elected to that house, it shall become a law."

It is sought to construe this language as though it read: "The house in which a bill originates shall retain exclusive custody of it when vetoed by the govern-

or and returned to it by him, and shall not send it with the governor's objections to the other house until it reconsiders it.  And such bill shall not be reconsidered in the other house until it is finally disposed of in the  house of its origin.''

It is apparent upon the slightest consideration that no such negative words are found in the constitution. The prohibition against the senate acting in advance of legal action upon the part of the house is found by inference only.  The majority have concluded that because the constitution says that ''if after such reconsideration,'' it shall be passed by the house of its origin, ''it shall be sent with said objections to the other house by which it shall be likewise reconsidered,'' therefore the bill did not become a law because this is in effect a command to the senate forbidding it to act upon the bill unless a quorum were present in the house when that body reconsidered the bill.  Carried to its logical conclusion, the majority opinion must also hold that if the house should have passed the bill with a quorum present, but had failed to cause the governor's objections to be entered at large upon its journal, that the senate would not be authorized to reconsider the bill upon receiving it from the house, and its action in such event would be void.  I think there are two fundamental errors in this position.  The first is in requiring the senate to sit in judgment upon the validity of the proceedings of the house as a condition precedent to its right to reconsider the bill.  The second is in drawing an inference from a mere form of procedure

which has for its inevitable effect the defeat of the main objects and purposes for which this clause of the constitution was written. On the first point I can only reply to the holding of the majority by saying that I have never before heard of any case which held that one branch of a legislative body either could or should undertake to determine, or in any manner sit in judgment upon the validity of the action of the other branch. It is true that we have cases in which this court has looked to the journals of both the senate and the house to determine whether a given measure had been constitutionally enacted. But we have no case in which the court has looked to the journal of one house for the purpose of determining that the other house had acted unconstitutionally. The validity of the action of each house must be measured solely and alone by its journals. The constitution expressly provides that each house of the general assembly shall keep its journal and shall have all the powers necessary to a branch of the legislature of a free State.

Upon the second point there are numerous authorities which hold that positive words in a constitution will not be given a negative meaning when such a construction would destroy some of the most important objects for which the power was created. *Cohans* v. *Virginia,* 6 Wheat., 395, 5 L. Ed., 257. The case cited was brought to the supreme court of the United States on a writ of error to the quarterly sessions court of the borough of Norfolk. It was maintained that the supreme court had no appellate jurisdiction of any suit

to which a state was party; that the affirmative words of the constitution conferring upon that court original jurisdiction of such suits were exclusive in their operation and denied to the court appellate jurisdiction of these suits. The court said:

"But although the absence of negative words will not authorize the legislature to disregard the distribution of the power previously granted, their absence will justify a sound construction of the whole article, so as to give every part its intended effect. It is admitted that 'affirmative words are often, in their operation, negative of other objects than those affirmed,' and that where 'a negative or exclusive sense must be given to them, or they have no operation at all,' they must receive that negative or exclusive sense. But where they have full operation without it, where it would destroy some of the most important objects for which the power was created, then, we think, affirmative words ought not to be construed negatively. . . . .

"It is, we think, apparent, that to give this distributive clause the interpretation contended for, to give to its affirmative words a negative operation, in every possible case, would, in some instances, defeat the obvious intention of the article. Such an interpretation would not consist with those rules which, from time immemorial, have guided courts, in their construction of instruments brought under their consideration. It must therefore be discarded. Every part of the article must be taken into view, and that construction adopted which will consist with its words and promote its gen-

eral intention. The court may imply a negative from affirmative words, where the implication promotes, not where it defeats, the intention.''

*Cohans* v. *Virginia,* supra, applied a familiar and generally accepted rule of construction laid down almost universally by writers on constitutional law, but of course stated in different terms by many of them. The rule was stated by this court in the case of *Prescott* v. *Duncan,* 126 Tenn., 130, 148 S. W., 234, as follows:

''Powers conferred, as well as restraints upon inherent power, may be supported by such implications as are necessary to give effect to the intent of the people in conferring the one or setting the bounds of restraint upon the other. . . .

''No implication of intention with respect to one part of the instrument can be justified which does violence to a plainly expressed intention to be found in another part. . . . Necessary implications may be made, but unnecessary ones, however probable or plausible, cannot. And the necessity for the implication must be found in the constitution.''

The implication with respect to the procedure of the two houses drawn by the majority is not to support the exercise of a power conferred on them, but it is an implication to defeat the exercise of a power plainly created. Omitting the words in the constitution which prescribe the procedure of the two houses, it clearly appears that if they reconsider the bill in the light of the governor's objections, and take the yeas and nays

and a majority of all the members elected to each house shall agree to pass the bill, notwithstanding the objections of the executive, "it shall become a law."

I think it clear that the jurisdiction of either house to pass a bill must arise from the introduction of the bill by a member thereof, or by receipt of it from the other house with a *prima facie* showing that the bill has been passed by the house of origin. But the same bill may be introduced in both houses simultaneously, and they may consider it concurrently on the first and second readings; and a bill so considered and passed by one house on its first, second, and third readings and sent by it to the other house, where it has been passed on two readings and there substituted and passed a third time, is a law. *Archibald* v. *Clark,* 112 Tenn., 533, 82 S. W., 310. And in *Railroad* v. *Memphis,* 126 Tenn., 292, 148 S. W., 662, 41 L. R. A. (N. S.), 828, Ann. Cas., 1913E, 153, a bill was held to have been constitutionally enacted which was passed by the house on two separate readings, and was then referred to a committee. The committee substituted another bill for the original bill, the body of which was essentially different from the original; the title remaining the same. Upon recommendation of the committee, the house passed the substituted bill upon its third and final reading, treating the passage of the original bill upon its two separate readings as sufficient to make the final passage of the substituted bill a passage upon its third reading. It was then sent to the senate, and there passed upon three separate readings.

The holdings just referred to were made, notwithstanding the procedure in such matters pointed out by the constitution, section 18 of article 2, is that "every bill shall be read once, on three different days, and be passed each time in the house where it originated, before transmission to the other house. These cases are in absolute conflict with the holding of the majority. Neither the bill considered in *Archibald* v. *Clark,* supra, nor the one in *Railroad* v. *Memphis,* supra, was read once on three different days in the house of its origin before it was transmitted to the other house. Still the bills were read three times in each house on three different days, and the cases cited hold, in effect, that this is a reasonable and substantial compliance with the procedure of the constitution, and that is all that ought to be required.

These cases show that this court has never strictly construed the requirements of the constitution as to matters of procedure, and has always regarded the substance of the requirement rather than its form. The main objects and purposes of these provisions are to secure a reading and a consideration of the questions of legislation, rather than a particular order or sequence in which the houses are to act. They also show that this court has never considered the presence of the identical paper on which a bill is written as necessary to the power of either house to act upon the legislative proposition embodied in the measure.

After the house assumed to pass the bill over the governor's veto, on April 3d, it ordered the bill to be

transmitted to the senate for its reconsideration. The clerk of the house appeared at the bar of the senate and said:

"I am directed by the house by motion to transmit to the senate House Bill No. 759, to amend the election laws, as having passed the house, the objection or veto of the executive to the contrary notwithstanding."

After receiving this message, the senate, with a quorum present, reconsidered the bill in the light of the governor's objections and passed it over the veto by the requisite majority. It is held by the majority that this action of the senate was void because a quorum was not present in the house when that body attempted to pass the bill over the veto. I do not understand the opinion of the majority to expressly say that the senate must determine the validity of the action of the house in such cases before it is authorized to enter upon a reconsideration of the bill, but, whether stated in terms or not, this is the necessary result of the conclusion reached. This, of course, leaves out of consideration a principle of universal application in governments like ours, which is that each house acts separately upon the passage of laws, and independently of the other. Indeed, that is the sole purpose of dividing the general assembly into two branches. It is to secure separate, distinct, and independent action in each branch, that such a division is made. Each house for the same reason is required to keep its own journal. The constitution requires each house to select its own speaker, clerks, and other officials. If either

house fails in some constitutional particular to properly enact a law, the law is just as invalid as if both houses should fail in the same particular. However, this does not mean that the two houses shall act jointly, or that the validity of the action of one must depend upon the validity of the action of the other. It only means that they must both concur in the constitutional sense in the passage of a measure before it can become a law.

So I think when the senate received House Bill No. 759 from the clerk of the house with the statement from him that the house had passed it over the governor's veto and had directed him to transmit the bill to the senate, it had a right to enter upon its reconsideration. The senate is not compelled to go beyond this apparent showing of legal action on the part of the house before it can act. It is not required, and it has no power, to determine the presence of a quorum in the house. The house was in session and transmitted the bill to the senate with a certificate from the proper officials that the bill had been reconsidered and passed. Literally, the bill (paper) was "sent" to the senate by the house, and it was its duty as "the other house" to reconsider it. The house claimed to have legally reconsidered the bill. It turns out by our adjudication in this case that this was not true.

But in what possible view can this affect the action of the senate? Its action must be adjudged from its own journal. Its journal shows that it properly and

legally received the bill from the house, and that it reconsidered and passed it as the constitution requires.

What is said by the majority upon the dangers of holding any provision of the constitution to be directory, and the references made to the warnings of great political and constitutional writers might be all right in a case to which they had application; but, without deciding this, I can safely appeal from the *dicta* of the constitutional and political writers referred to in the opinion of the chief justice to a solemn decision of this court in the case of *Telegraph Co.* v. *Nashville,* 118 Tenn., 1, 101 S. W., 770, 11 Ann. Cas., 824, in which it was held that a plain and unambiguous direction of the constitution is directory and not mandatory. The opinion appears to have been rendered by a unanimous court, but Brother Shields says in *State* v. *Burrow,* 119 Tenn., 376, 104 S. W., 526, 14 Ann. Cas., 809, that he did not concur.

In the case of Burrow, the court was considering a constitutional objection to the enactment of the Pendleton Bill, which it was claimed violated section 20 of article 2, providing "the style of the laws of this State shall be 'Be it enacted by the general assembly of the State of Tennessee.'" The act assailed was styled "Be it enacted by the general assembly of Tennessee," omitting the words "the State of." Much is said in this opinion against holding any provision of the constitution directory, and the court held in that case that the clause under consideration was mandatory, but it also held that the assailed act was valid,

because, although the words used in styling the act were not the same as those prescribed by this mandatory provision of the constitution, still they meant the same thing and the law was good. This case is authority against the holding of the majority. Its real meaning can only be that the constitution should receive a reasonable and sensible construction in matters of form and procedure, so as to uphold and sustain the power to enact laws conferred upon the general assembly. The clause must be held mandatory because it canot be given any effect, and would be entirely defeated if construed otherwise. *Cohans* v. *Virginia,* supra. In the opinion of the chief justice it is held that if the house of origin can constitutionally transmit a bill after veto to the other house before acting on it itself, with equal reason the governor may in his discretion transmit a senate bill with his veto to the house or a house bill to the senate, and from this conclusion many things are supposed to result which the framers of the constitution did not contemplate.

After sketching the order of sequence provided by the constitution, and concluding that it must be literally observed by the two houses, it is said with the confidence of conclusiveness that, "If one part is directory, all parts are." This opinion also supposes that the framers of the constitution had in mind the preservation of the ardor and zeal of the members of the legislature. I think both assumptions are erroneous. There is a reason found in the constitution for requiring the governor to return a vetoed bill to the

Webb v. Carter.

house in which it originated. The reason is that the constitution does not require the governor to either sign or veto a bill. If he holds it for more than five days without signifying either his approval or disapproval, it shall become a law. Therefore it is not only proper, but it is necessary in order to preserve the genealogy of a bill, that the governor should be required to return it to the house in which it originated if he disapproves it. If it should be returned to the other house, the history of the bill could not be obtained from an inspection of the journal of that house. So I think there is a clear distinction found in the constitution itself, and imbedded there for the purpose of preserving the power of veto conferred upon the governor, between the requirement that he shall return vetoed bills to the house in which it originated and the supposed requirement as to the sequence in which the two houses shall act.

And as to the other supposed purposes of the constitution—that is, the preservation of the zeal and ardor of legislators—I must concede to it the virtue of originality. It had always supposed before that State constitutions were made for the sole purpose of curbing and abating, not only the zeal, but the power, of legislators.

Now I do not say that the procedure under consideration prescribed by the constitution is directory, but I do say it should receive a reasonable construction so as to preserve and not to defeat the undoubted powers of the general assembly to which it relates. The sen-

ate had the unquestioned right, and it was its plain duty, to receive the bill from the clerk of the house and reconsider it as having been "sent" to it by the house. The right of the senate to enter upon a reconsideration of the bill cannot be assimilated to an appeal from an inferior to a superior court. Its right to act did not depend upon the legality of the action of the house, but upon the bill being sent to it by the house with a claim of legal action against the veto. The transmission of the bill from the house to the senate is not jurisdictional, but is procedural. The bill—that is, the proposition of legislation, and not the paper upon which it was written—was pending before both houses after it was vetoed by the governor until it was finally disposed of. It was far advanced on the way of becoming a law before it was transmitted to the governor. Had he signed it, it would have become a law. But when he vetoed it, the only effect upon the passage of the bill which his veto could have under the constitution was to require a reconsideration of it in both houses. This opened up the whole question in both houses and made it pending before them, and it remained a question of undisposed-of legislation until one of the houses legally acted unfavorably, or until both houses legally passed it over the veto, or until the general assembly adjourned *sine die*. Therefore I think it is but fair to say that the senate had authority to reconsider the bill and pass it over the veto. If this is true, of course the bill was a law, in so far as the action of the senate was necessary to make it so. But

at this time the house had not constitutionally reconsidered the bill and passed it over the governor's veto, but later, and on June 21st, the house did reconsider the bill in such manner that we all agree was valid, and therefore it is my opinion that House Bill No. 759 is a valid law.

The only right which the governor can insist upon in respect of his veto is the right to have the bill reconsidered in connection with his objections by a legally constituted house with a quorum present. The time, the order, the sequence of the action of the two houses are not of the governor's right.

This case legalizes the filibuster. As its results are upheld and apparently approved by the court of last resort, it will become the trick of the politician and the resort of the spoilsman. It is most doubtful if a time will come within our generation when a combination of spoilsmen, special interests, and petty political bosses cannot be made which can muster votes enough in one house or the other to break a quorum. Under the holding of the majority, when that event occurs, all that is necessary to thwart the majority will is to defeat the sequence of action in the two houses. So the framers of our constitution, instead of establishing a government in perpetuity with a system of checks and balances, have embodied in that instrument the germs of its own destruction, and have placed it within the power of a minority in the government to destroy organized society and inaugurate a reign of anarchy. In the face of threats which could be made by

designing men, although a minority, when entrenched behind the power which this decision gives them, it is not difficult to imagine that a majority of the people's representatives must either cease to act or act in obedience to the demands of the minority, however wicked and selfish they may be.

Justice Green and myself also dissent from the holding that Reichman was not validly elected successor to Stratton. Without elaborating our views, we think this feature of the case falls directly within, and is controlled by, *Williams* v. *State*, 6 Lea, 549. The majority have not in terms overruled this case, but I think in frankness they should do so. They do not follow it.